## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **NO. 3:15CR149 (AWT)** |
| **v.** | : | |
| **ARTHUR BERGENN** | : | **AUGUST 14, 2019** |

### SENTENCING MEMORANDUM ON BEHALF OF ARTHUR BERGENN

Fundamental changes are difficult for anyone to make, but over the past four years Arthur Bergenn has made real, substantive, and permanent changes in his life. The person who stands before the Court in August 2019 is fundamentally different from the person who engaged in the offense involved here in 2010-2014, or the person who was arrested on September 13, 2015.  For the past four years, Arthur Bergenn has shown, by his repeated and sustained conduct, that he is and will continue to be a tremendous asset to the community.  He has gone from being a directionless young man to a focused adult, who has combined his passion for music with his innate and learned abilities to help special needs individuals move forward in their lives in exemplary fashion.  A quiet, self-effacing young man, Arthur has carefully nurtured and advanced the lives of countless others.  He has done so through his work, through his countless volunteer hours, and through his patience, love and insight into those with whom he is working.  Time and time again, he has done the extra things, the "little" things that often make all the difference in the lives of others.  In doing so, he has enriched the lives not just of the special needs individuals with whom he has worked since 2015, but also all those with whom he works and lives.

The guidelines suggest a lengthy sentence of incarceration.  In this case the guidelines are wrong.  The Court has a special opportunity in this exceptional case.  It

can embrace all that Arthur Bergenn has done to enrich his community and the lives of all the people he has touched, and allow him to continue to develop his unique set of special skills, or can remove him from the community and incarcerate him.  For all the reasons set forth here, in the attached letters, and in the words of those the Court will hear from at sentencing, a sentence of probation (or credit for time served and a term of supervised release), coupled with a condition that Arthur complete a substantial amount of community service hours, is in the interest of justice, and will satisfy all the traditional and statutory goals of sentencing.

**Offense Conduct**

Arthur Bergenn dropped out of Eastern Connecticut State University in 2006, and traveled to California to be with his then-girlfriend.  When he got to California, he discovered that she was cheating on him and was with another man.  Despondent and heartbroken, he hooked up with his cousin, who was living in a van on Venice Beach. PSR at p, 12, ¶ 29.  He learned that the cousin had a medical marijuana card, something that virtually anyone could get at the time in California, and was selling the marijuana to tourists.  Arthur began to sell marijuana with his cousin, and eventually brought some back to Connecticut and sold it here.  To help his mother out, he offered her the proceeds, but when she learned the source of the funds she refused and kicked him out of the house.  PSR at p. 12, ¶ 30.  He repeated this trip to California and back, coming again with marijuana to sell.  Near the start of this pattern, his father Eric Bergenn became involved, and encouraged him to move into the marijuana growing business.  He advised Arthur that he could sell the weed here in Connecticut so Arthur did not have to travel back and forth.  He encouraged Arthur to buy properties in

Northern California he could use as grow farms, provided the money to do so, and Arthur did so.  Arthur's efforts at growing marijuana were neither diligent nor highly successful, so much of the time he bought marijuana from other weed farmers and mailed it back to his father.  He ultimately let others grow the weed on his land, and would often pay them with the product.

His father was a life-long schemer, always coming up with new ways to make money and avoid paying taxes, and would share these ideas with his son.  Eric Bergenn was the driving force behind opening numerous bank accounts and structuring deposits.  He was also a compulsive gambler, and as the records demonstrate, much of the profits from the marijuana business were lost by Eric Bergenn at Connecticut casinos (and perhaps others in adjoining or nearby states):

> In paperwork from Foxwoods Casino provided to the Probation Office, it is noted that between 2012 and 2018 Eric Bergenn lost $580,665 at the casino, primarily in slot machines.

Sentencing Memorandum on behalf of Eric Bergenn, Document 173, filed 02/01/19, at p. 4.  That loss was at Foxwoods alone, and quite likely does not encompass all of his gambling losses during that or other related time frames.

A consistent theme in Arthur's life is that he enjoys helping others, and while there is no doubt that he lived off the profits of his marijuana sales for the period stated in the Indictment, he also gave much of the profits away to other people in need.  As he noted during the second PSR interview of February 7, 2019, "'I didn't enjoy selling pot, but I enjoyed helping people financially."  PSR at p. 13, ¶ 34.

There is no doubt that Arthur Bergenn's conduct lasted over several years, and a substantial amount of marijuana was sold.  While the conduct is serious, it must also be

considered in four important contexts: (1) Arthur Bergenn's attitude and outlook on life at the time; (2) the unique milieu of marijuana farms and sales in Northern California during the period in question; (3) Arthur's youthfulness at the time of the offense conduct; and (4) the extreme negative impact of his father on his decision-making.  He slipped into the sale of marijuana at a time when he was feeling extremely low. Crushed by the infidelity of his girlfriend, he found himself across the country at age 21, without money, direction, or friends.  From that position, it was not a large leap to sell marijuana with his beach-living cousin.  Marijuana was plentiful, readily available, and consumed by hordes of California residents and tourists alike.

Much has been written about this generation of young men, many of whom appear to be sleepwalking or drifting through life, without any clear direction, ambition, or goals.  *See*, *e.g.*, "Males at risk: 'Boy crisis' of identity jeopardizes America's future," USA Today, 4/7/19, https://www.usatoday.com/story/opinion/2019/04/07/males-risk-boy-crisis-identity-ameri ca-future-addiction-suicide-column/3331366002/ (attached as Exhibit A); "10 Habits That Change Boys Into Men - The Mission - Medium," https://medium.com/the-mission/10-habits-that-change-boys-into-men-b103c47d47e0 (attached as Exhibit B).  During this period of Arthur Bergenn's life, he was drifting, going along with the flow.  His cousin (and, it appeared to Arthur, almost everyone else) was involved in the thriving California marijuana business.

The small sales and buys in the LA area became bigger and more frequent when Arthur moved to northern California, commonly known as the epicenter of marijuana farming in the United States, if not the world.  Arthur indicated to Probation that

marijuana production in a multi-county area of northern California is "'how their economy stays afloat,'" and he is correct.  It is an area where marijuana farms are now multi-generational, the laws are only sporadically enforced, and farm owners are respected members of their communities and at times even hold public office.  This environment is far from that which we have in Connecticut, and a vast amount of material has been written about the unique nature of this area of northern California. *See*, *e.g.*, "Playing The Game: Marijuana Growing In A Rural Community," thesis by Karen D. August, Humboldt State University, 2012, at p. 96; http://humboldt-dspace.calstate.edu/bitstream/handle/2148/978/Augustthesis%20FINAL _DRAFT.pdf?sequence=3 ("As more states move to allow medicinal use and decriminalize marijuana possession, it is likely the number of growers will increase to meet the demand, as was the case in California following the legalization of medical marijuana. These growers could be the clerk in the video store, the teller at the bank or the parent next to you at P.T.A. meetings. They cannot be identified by their appearance, their possessions or their community activities. They may be the neighbors") (footnote omitted); "Few Legal Consequences For Growers Gaming California Marijuana Laws," CBS SF Bay Area, 10/1/14, https://sanfrancisco.cbslocal.com/2014/10/01/few-legal-consequences-for-growers-gam ing-california-marijuana-laws-pot-humboldt-county-crime-sheriff-district-attorney-cultivati on-possession/ (in Humboldt County, "109 people were arrested or cited for cultivation and possession of marijuana for sale. While 86 were charged by the district attorney, only seven were ever convicted.... Even more striking: The police officers who conduct the raids on illegal pot grows told us in the last five years, not one single cultivation

case has gone to trial in Humboldt County") (attached as Exhibit C);[1] "How Legal Weed Is Killing America's Most Famous Marijuana Farmers," Politico Magazine, 6/4/19, https://www.politico.com/magazine/story/2019/06/04/humboldt-county-marijuana-farmer s-regulations-227041 ("In an ideal season, Mulder's farm produces about 1,000 pounds of cannabis, an amount that should earn him $1.5 million. After taxes, fees and farm operating expenses, Mulder can expect about $100,000 in net income. It has afforded him enough money to own his own house and set aside a retirement account and a college fund for his children. No longer an outlaw like his parents, Mulder is the very picture of middle-class respectability. He has served on the local school board for a decade without anyone batting an eye at how he earns a living") (attached as Exhibit E).  While it might be hard for many Connecticut residents to envision, there is even a burgeoning cannabis tour business in California, where people are taken to various marijuana farms in northern California and other parts of the State.  *See*, *e.g.*, "Cannabis Farm Tours: Departing from San Francisco," https://mendoexperience.com (attached as Exhibit F).

While none of this justifies in any way Arthur Bergenn's conduct, it hopefully provides the Court with a snapshot of the prevalence and importance of the marijuana industry to the northern California economy, and the acceptance of the business and the growers in the area throughout the time period involved in this case.  It is not difficult to understand how a drifting young man, urged on by his own father, could justify his

---

[1]  While Humboldt, Trinity and Mendocino counties are often referred to as the "Emerald Triangle," Tehama County (location of Bergenn properties) adjoins Trinity and Mendocino counties, and has very similar circumstances to the three counties comprising the Emerald Triangle.  *See* California County Map, attached as Exhibit D.

conduct in joining the thousands upon thousands of other marijuana growers in California.  In addition, there is perhaps no other area of the country where the conflict between federal and state laws, a mounting reality across the country, is more pronounced.  While many states legalize or de-criminalize marijuana, the federal government continues to categorize it as a Schedule I drug.

Meanwhile, it is the rare case in which marijuana growers in northern California are subjected to any criminal sanctions at all.  Congress has dictated that one of the factors a sentencing court must consider is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  It is respectfully suggested that a related factor the Court can also properly consider is the situation here, where thousands of other similarly situated individuals are never prosecuted at all for the same or more egregious conduct.

In addition, a factor for the Court to consider is that when Arthur Bergenn first became involved in selling marijuana in California in or about 2006, he was only 20 years old.  In its report in May 2017, *Youthful Offenders in the Federal System* (herein referenced as the "Youthful Offenders Report")[2], the Commission begins by defining a youthful offender as a person "age 25 or younger at the time they are sentenced in the

---

[2]  This report can be accessed at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publicati ons/2017/20170525_youthful-offenders.pdf

 federal system."  Report at p.1.[3]  As the Youthful Offenders Report explains:

"[t]raditionally, youthful offenders often have been defined as those under the age of 18,

but for purposes of this study, the Commission has defined youthful offenders as a

federal offender 25 years old or younger at the time of sentencing. The inclusion of

young adults in the definition of youthful offenders is informed by recent case law and

neuroscience research in which there is a growing recognition that people may not gain

full reasoning skills and abilities until they reach age 25 on average." *Id.* at 5.

The Youthful Offenders Report notes that "researchers caution against the

over-generalization of brain science", but summarizes the emerging scientific

consensus concerning brain maturation as follows: "[T]here are a number of points on

which researchers in this area generally agree. First, researchers agree that the

prefrontal cortex is not complete by the age of 18, which is the legal age of majority in

most state jurisdictions and in the federal system. Second, researchers agree that

development continues into the 20s. Third, most researchers reference 25 as the

average age at which full development has taken place, but note there will be significant

variation from person to person." *Id.* at 7.

Arthur's conduct is also significantly mitigated by the criminal conduct of his own

father.  Decent fathers, to say nothing of good fathers, do not use drugs in front of their

own children, but Arthur's father did.  Decent fathers do not invite their 13-year old son

---

[3]  While the Commission referenced age at the time of sentencing, that
barometer makes little sense in a case such as this where sentencing is so far removed
from the time of the offense conduct.  While Arthur is now 33 years old, his relevant
conduct started at about age 20 and lasted until he was about 28, and that age frame is
the relevant focus.

to smoke marijuana with them, but Arthur's father did.  Decent fathers do not encourage their son to engage in illegal activity, but Arthur's father did. Decent fathers do not fund their son's illegal activity, but Arthur's father did.  Decent fathers do not actively engage in criminal conduct with their own son, but Arthur's father did.  And decent father's most assuredly do not engage in the kind of repeated conduct set forth in the PSR on page 17 at paragraph 59, but Arthur's father did.  All of this had a lasting impact on Arthur Bergenn, and contributed in fundamental ways to his decisions to sell marijuana, develop a marijuana grow operation, and continue with that over time.  This is not exactly a case of lack of parental guidance, rather it is far worse.  It is parental guidance that encouraged Arthur to commit and continue to commit illegal acts.

When Arthur's conduct and the Sentencing Guidelines are examined, the only reasonable conclusion is that the guidelines are unreasonable in the specific context of this case.  Rather than punish the father more harshly for his egregious conduct, the guidelines create the perverse result that Arthur would be treated far more harshly than his father if the guidelines were followed.  Below is a comparison of the calculations in the two cases:

|                          | Eric Bergenn    | Arthur Bergenn  |
|--------------------------|:---------------:|:---------------:|
| Base Off. Level  (Ct.1)  | 20              | 20              |
| Gun Adjustment           | 0               | +2              |
| Drug Premises            | 0               | +2              |
| Grouping Analysis        | +2              | +2              |
| Acceptance               | -3              | -3              |
| Safety Valve             | -2              | 0               |
| Total Offense Level      | 17              | 23              |
| Guideline Range          | 24-30 months    | 46-57 months    |

Despite the fact that Eric Bergenn was present at the time of the searches on August 11, 2014, and that the .45 caliber handgun was unsecured because Eric believed people were after him after he had been robbed in Connecticut, the gun adjustment has been applied only to Arthur Bergenn.  Even though the guns were purchased principally to protect livestock, Arthur Bergenn agrees he cannot establish that "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, App. Note 11(A).  Despite the fact that Eric Bergenn was the principle investor in the searched properties, only Arthur Bergenn has received the 2-level adjustment for maintaining a drug premises.  Finally, because the gun adjustment is technically applicable, Arthur Bergenn cannot seek the safety valve adjustment, while his father can and did.

The notion that the guidelines "should" be virtually doubled for Arthur Bergenn is, to be blunt, absurd.  It is appropriate that parents who encourage their children to

violate the law, spearhead the violations, and participate fully in the activity, are sentenced more harshly than their young adult children, but here the guidelines suggest exactly the opposite result.  Under all the circumstances here, it is appropriate for the Court to disregard the guidelines as creating an unjust result, and start the analysis by concluding that, at the very least, Arthur Bergenn should start at the same guideline range as his father, i.e., 24-30 months, and then take into account the enormous amount of mitigation here.  That approach would far better satisfy the dictate of 18 U.S.C. § 3553(a)(6) that the Court "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  Here, they have similar records (no prior convictions), and are guilty of similar conduct, yet father and son have widely disparate guideline ranges.

**Arthur Bergenn is a Markedly Different Person Than the Young Adult Who Engaged in the Admitted Criminal Activity.**

The development of Arthur Bergenn as a person since he was arrested is truly remarkable.  Far from drifting through life as before, he has coupled his passion for music with his other passion in life, namely working with people with disabilities.  A little over a month after his arrest and week-long period of incarceration at Wyatt, he found full time employment with Horizons Inc., a non-profit serving the developmentally disabled in the greater Willimantic area (Horizons website is at www.horizonsct.org/). After working in the day program as a support coach, he became a Manager, but also was fully involved in the music program at Horizons that is now about three years old.

Many people never find a line of work they are passionate about, and Arthur is indeed fortunate to have found his.  His passion for both music and working with the

developmentally disabled is coupled with his expertise in both areas.  The letters

attached to this memorandum speak volumes about the positive impact he has had on

so many people with whom he has worked.  At the same time that he has grown

exponentially, he has enhanced the lives of those with whom he has worked.  His

growth has allowed him to examine fully the wrongfulness of his conduct.  As noted in

the PSR, he realizes that the marijuana world, legal as it might be in the future, "was

never my path."  He stated that "[t]his is my path - music.  I love working with people

with disabilities.  It's much more rewarding."  He continues to worry about the impact of

marijuana use on young developing minds, and regrets his failure to think about that at

the time.  PSR at p. 13, ¶ 34.

      While he is usually quiet and reserved, when he begins to speak about his work

he lights up an entire room.  See PSR at p. 25, ¶ 105.  He has extraordinary sensitivity

to the needs of each individual person with whom he works, and has a unique talent to

bring out the best in them.  As noted by MaryAnn Paul in her letter of May 25, 2019:

> The first few music club meetings Cait sat at the piano looking frightened
> and very anxious. I accompanied her to be her "interpreter" if things got
> too overwhelming for her. I recall noticing the quiet young man who was
> helping with the group, Artie. Always pleasant and kind, Artie struck me
> because he also seemed to instinctively know how to use music as a
> vessel to help the group members succeed. Whether pulling up a chair to
> model a beat for a drummer who was struggling through a song or gently
> helping a guitarist through the song's chord progression just in time to
> avoid undo stress, Artie always seemed invested in the success of each
> music club member....
>
> Today, Cait still cannot speak in her normal tone when conversing with
> people she is not comfortable with. Artie is not one of those people. He
> has gained her trust as well as the respect of my entire family. I feel badly
> for Artie many times because Cait will not stop talking to him until she has
> uttered the last minor detail of an important event in her life, such as what
> she ate for dinner the night before. Artie, engaged in listening to Cait to

the bitter end, always seems truly interested in everything she has to say.
I guess what I'm trying to say is that the world is full of people who have
better things to do than to take the time to help another human. Again,
Artie is not one of them. I understand the charges brought against him are
serious in nature. However, the positive impact he has had in the life of
some of society's most vulnerable is not only significant but life changing.

MaryAnn Paul letter attached as Exhibit G.

Not only has he touched the lives of the Horizons clientele, he has also had a

positive impact on the lives of those with whom he has worked.  As Jim Turner states in

his May 6, 2019 letter:

No two bands are alike, and yet in all these cases Artie brings a
dedication and focus that lifts the entire enterprise. He is serious about
the music he makes. He works hard at songwriting, at arranging, at
creating vocal harmonies and crafting guitar and piano parts. He does his
homework and comes to practice ready to work. That diligence, combined
with his passion and generosity of spirit, makes for a compelling
bandmate. He is deserving of maybe the highest accolade you can give a
musician: He makes people around him better.

Artie has taught the young Horizons musicians a lot about being prepared
and relaxed and focused. I have to say I've learned similar lessons from
Artie. I am a better musician after working with Artie, especially when it
comes to singing. But he has also taught me things about working
constructively with folks with disabilities. There are similar skills involved:
focus, centeredness, patience, attentive listening. Not trying to do too
much. Being respectful of others' intentions.

Jim Turner letter attached as Exhibit H.

Unfortunately, after Arthur's father was sentenced on February 28, 2019, the

U.S. Attorney's Office issued a press release that discussed the sentencing, the overall

case, and Arthur's role in it.  Horizons had been unaware of the charges, as upon

advice of counsel Arthur did not volunteer that information at the time of his interview.

While it is always a difficult decision, far too many defendants in federal court lose their

jobs due to similar press releases or other publicity.  Undersigned counsel will give the

-13-

same advice to future clients, given how many times volunteering the information has

backfired and closed doors (this has happened in two other cases handled by

undersigned counsel since February).  Understandably, however, the leaders at

Horizons were hurt; it is a close-knit, family-like organization, and it was upsetting to

some that someone so integral to the family had kept this case hidden.  Beyond that,

the organization felt the need to create a uniform policy on these types of recurring

situations, so felt compelled to terminate Arthur despite his stellar work.

To say that this was a tremendous setback for Arthur would grossly understate

the reality.  He lost a job he loved, that mixed in a perfect way his dual passions and

brought out the best in him.  Rather than give up and wait for sentencing, however, he

continued to persevere and move forward.  Since shortly after his dismissal Arthur has

been working on a volunteer basis for another non-profit in the Willimantic area,

Community Recording Services, Inc. ("CRS") (website at

https://communityrecordingservices.org/).  He had interfaced with them often during his

time at Horizons, had played in a band with the program's founders, and the transition

was, in many respects, seamless.  As noted by Karen Davis of CRS in her July 27,

2019 letter:

> It took moments to realize that [Artie] has a superior gift for music. His
> pure and angelic voice has the power to move one to tears, his technical
> skill and strong foundation in theory allow him to transfer his knowledge to
> several instruments, and his ability to adapt and listen and leave room for
> others makes him an asset to any musical outfit. Over the years that we
> have been playing together, he has taught me so much about voice, song
> structure, and instrumentation that I am definitely a better musician
> because of his influence. He also has a way of gently nudging a person
> out of his or her comfort zone, and on to the next level.

> Our band rehearsals were generally held on Wednesday evenings, after
> the weekly Horizons Music Club sessions, so Artie and Jim would arrive at
> the same time, still abuzz and gushing about the musicians with whom
> they worked, and it was through these stories that I began to realize that
> Artie has an inherent and deep compassion for his fellow human, and an
> even greater soft spot and love for the community at Horizons. It is a
> remarkable type of person that can relate on such a level with individuals
> with disabilities; he is empathetic and deeply respectful, understanding
> and accommodating, and a tireless advocate on behalf of this community.

Karen Davis letter attached as Exhibit I.

CRS has found many ways to use Arthur's talents, enthusiasm and availability, and he has already contributed substantially to their progress. They are in the process of buying an old church as an office and studio, and Arthur's carpentry skills, coupled with his music skills and ability to deal with the developmentally disabled, would be invaluable to them moving forward.

Arthur's has volunteered his time to many different organizations and people over the last four years.  He has given private music lessons to several of the Horizons clients with whom he has worked, and when questioned as to why he was not charging for private lessons, he advised counsel that he did not want to interfere with the purity of the process by bringing money into the equation.  He has also given lesser amounts of time to Habitat for Humanity and a local soup kitchen.

The fundamental changes in Arthur also are manifested in his relationship with his fiancee, Olivia Murphy.  In her August 4, 2019 letter she notes:

> For the semesters in college that I have known Arthur, for both my B.S.
> and M.S. degrees, were semesters where I had the highest GPA out of
> my entire school career. I contribute this fact to Arthur, he has a way of
> inspiring people to be the best version of themselves. I would not have
> graduated with my Master's degree in Microbiology and Cell Science on
> time without Arthur's endless encouragement and support. While none of
> my family or friends attended that graduation, Arthur did. He came

-15-

because he followed me so closely on that journey that he knew exactly how much time and work I put into it. He came because he knows what truly matters to people....

He continually makes sacrifices so that other people, and animals, can enjoy their lives and be happy....

I have never seen anybody as proud as Arthur is about his students. He would come home and excitedly tell me what they did in Music Club that day at Horizons. He always looked forward to the one day a week where he could teach and play music with his students. One year, one of his students, Cait, gave him a jar candle as a gift for his birthday. There is text on the side of the jar that reads, "Behind every musician who believes in themselves is a teacher who believed in them first." The day Arthur brought home that candle, he said it was the most meaningful gift he had ever received. He really believes in the talents of others, and having somebody like that present in your life is one of the greatest things you can have. I can say with confidence that Arthur is my biggest support, and I am sure there are countless others who will certainly say the same.

Olivia Murphy letter attached as Exhibit J.

The attached letters are extraordinary, because Arthur Bergenn has transformed his life in significant ways, and unearthed the talent and passion he already had and utilized it in every aspect of his life.[4]   The Court is faced with a fundamental choice: it can allow him to continue to contribute in highly positive ways to the Willimantic community, or it can warehouse him at the financial cost to taxpayers of over $36,000 a

---

[4]   The following letters are also attached to this memorandum: (1) May 31, 2019 letter of Devannie Cesar attached as Exhibit K; (2) April 26, 2019 letter of Joseph Parla attached as Exhibit L; (3) May 3, 2019 letter of Eileen Prusak attached as Exhibit M; (4) July 15, 2019 letter of Raymond Fricano attached as Exhibit N; (5) August 5, 2019 letter of Simon Wells attached as Exhibit O; and (6) letter of Lisa A. Marien attached as Exhibit P.  In addition, there is a June 12, 2019 WILI 1400 AM/ 95.3 FM interview of Jim Turner of Horizons, Karen Davis of CRS, and the Pauls regarding the Horizons Music Club CD that was recorded by CRS, and provides much background on both non-profits and the music club itself, as well as Arthur's role in it.  The link to that interview can be found by googling wili1400/61219-horizons-music-club.  Finally, the actual CD of the Horizons Music Club will be delivered on August 15, 2019 to the Court, the government, and the Probation Office.

year.  Arthur is eager to continue with his volunteer efforts, while hoping that those efforts will also allow him to become a full-time paid employee of CRS.  He would love to volunteer at Horizons, but as of now that is not a possibility.  Our proposal is that the Court order him to perform a substantial number of community service hours, such as 1,500 hours, over the course of his supervision. At 20 hours a week, that amount of community service would take about 75 weeks to complete.  At 10 hours a week, it would take 2 1/2 to 3 years to complete this amount of community service.

Such a sentence is consistent with the changes in the federal criminal justice system that have been occurring over the last few years.  As a society, we have come to realize that we over-incarcerate, especially in drug cases, and perhaps most acutely in the context of marijuana offenses.  The First Step Act has led judges in this district and elsewhere to make drastic cuts in sentences that we now know were far too harsh. *See*, *e.g*, *United States v. Lloyd Streater*, 3:97CR232 (MPS), Document 646 (attached as Exhibit Q) (sentence reduced under First Step Act from 480 months to 306 months). In addition, notions of restorative justice are being discussed far more often, as we attempt to have punishments fit the crime and the circumstances, and attempt to heal wounds.  *See*, *e.g*, "Symposium: Sentencing Guideline Law and Practice in a Post-Booker World: Rethinking Sentencing Post-Booker: Restorative Justice in Federal Sentencing: An Unexpected Benefit of Booker?," 37 McGeorge L. Rev. 787 (2006). Here, the damage inflicted by Arthur Bergenn's conduct was on the community in general, and a requirement of substantial community service constitutes the essence of restorative justice.

In many respects the facts and circumstances of Arthur Bergenn's extraordinary efforts at rehabilitation and life changes parallel, and exceed, those of Brian Gall in the seminal guidelines case of *Gall v. United States*, 552 U.S. 38 (2007).  In that case, Gall was involved for a brief time in an ecstasy conspiracy, but the case was not indicted until 3 1/2 years after he had withdrawn from the conspiracy.  In the interim, he had graduated from college, become a master carpenter, and did not sell or use drugs of any kind.  In the words of the district court judge, Gall had "self-rehabilitated." 552 U.S. at 40.  Gall then entered into a plea agreement accepting responsibility for an amount of ecstasy equivalent to 87.5 kilos of marijuana, an amount higher than that involved here.  *Id*. at 42.  The district court imposed a 3 year term of probation, deviating from the guideline range of 30-37 months.  In sentencing Gall, the Judge stated:

> Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the Court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life. The Defendant's post-offense conduct indicates neither that he will return to criminal behavior nor that the Defendant is a danger to society. In fact, the Defendant's post-offense conduct was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life.

*Id*. at 44-45.

The Eighth Circuit Court of Appeals reversed, concluding that the variance must be supported by extraordinary circumstances, and that they did not exist.  In reversing that decision, the Supreme Court held in a 7 to 2 decision that extraordinary circumstances were not required.  It underscored the following points: (1) probation is less harsh than incarceration, but nevertheless involves significant restraints on an offender's liberty; (2) a rigid, mathematical formulation or requirement of extraordinary

circumstances is inconsistent with *Booker*; and (3) "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id*. at 52 (citation omitted).  In addressing the specifics of Gall's case, the Court further noted that:

> [T]he unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing" ....
>
> Given the dramatic contrast between Gall's behavior before he joined the conspiracy and his conduct after withdrawing, it was not unreasonable for the District Judge to view Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future....
>
> The District Court quite reasonably attached great weight to Gall's self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative. This also lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts.

*Id*. at 54, 58-59.

This Court, acting well before both *Gall* and *United States v. Booker*, 543 U.S. 220 (2005), imposed a probationary sentence where the guidelines were substantially higher, where it found that, *inter alia*, the offender had established over almost a four-year pretrial supervision period that he had taken extraordinary steps toward rehabilitation and was in many respects a different person from the time of his arrest. *United States v. Alonzo Brooks*, 03:99CR94 (AWT).  While this Court has often

sentenced within the applicable guideline range, it has also deviated radically from such range where the unique constellation of facts supports it.  Even before *Booker*, *Gall* and their progeny (at a time when extraordinary efforts were required), our Court of Appeals acknowledged the critical role that extraordinary efforts at rehabilitation can have on sentencing:

> [A]wareness of one's circumstances and the demonstrated willingness to act to achieve rehabilitation, thereby benefitting the individual and society, can remove a case from the heartland of typical cases, thus constituting a valid basis for departure.

*United States v. Core*, 125 F.3d 74, 76 (2d Cir. 1997).

This is such a case, and probation is the sentence that is "sufficient, but not greater than necessary," to satisfy the traditional goals of sentencing.  18 U.S.C. § 3553(a).  As in *Gall*, imprisonment in this case would deprive the Willimantic community and all of society of the contributions of Arthur Bergenn, who understands the consequences of his criminal conduct and is doing everything in his power to forge a new life.

Respectfully submitted,

THE DEFENDANT,
ARTHUR BERGENN

  /s/  Richard A. Reeve

August 14, 2019

Richard A. Reeve
Sheehan & Reeve
350 Orange Street, Suite 101
New Haven, CT   06511
(203) 787-9026 (phone)
(203) 787-9031 (fax)
rreeve@sheehanandreeve.com
Federal Bar No. ct05084

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this SENTENCING MEMORANDUM ON BEHALF OF ARTHUR BERGENN was filed electronically and sent by first-class mail, postage prepaid, on this 14th day of August, 2019, to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

      /s/   Richard A. Reeve
      Richard A. Reeve